UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

        Plaintiff,                                 Case No. 3:25-cr-52

vs.

TERRANCE PETERSON,                    District Judge Michael J. Newman

        Defendant.

---

### ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (Doc. No. 28)

---

In this felony case, Defendant Terrance Peterson is charged in a two-count indictment with (1) conspiracy to distribute and possess with intent to distribute cocaine and fentanyl, and (2) possession with intent to distribute cocaine and fentanyl. Doc. No. 14. This case is before the Court upon Defendant's motion to suppress (Doc. No. 28) raising Fourth Amendment challenges to the traffic stop and the subsequent events up to and including his arrest.

The Court previously held an evidentiary hearing on Defendant's motion during which the Government presented witness testimony and multiple police videos. Doc. No. 31. The parties have since filed post-hearing memoranda. Doc. Nos. 33-35.

### I.      The Parties' Contentions

Defendant seeks an Order suppressing all the evidence police obtained during the traffic stop of the Nissan Altima ("the Nissan") he was driving on June 5, 2025 on and near Interstate I-70 in Montgomery County, Ohio. Doc. No. 28; Doc. No. 33 at PageID 215. Defendant contends the traffic stop, his seizure and investigative detention, the canine ("K-9") open-air sniff, the resulting search of the vehicle, and his arrest were unsupported by either reasonable suspicion or

probable cause in violation of the Fourth Amendment.  Doc. No. 33 at PageID 208-14.  Reasonable

suspicion to support the traffic stop was lacking, in Defendant's view, because Drug Enforcement

Agency ("DEA") agents based their request to Ohio law enforcement officers to stop the Nissan

almost entirely on a tip they had received from an anonymous and unreliable confidential

informant.  Doc. No. 28 at PageID 67-71; Doc. No. 33 at PageID 208-10; Doc. No. 36 at PageID

238-41.

Defendant also claims that officers violated the Fourth Amendment by performing a K-9

open-air search of the Nissan, thus prolonging the traffic stop "beyond the time reasonably

necessary to complete the mission of writing a traffic ticket and making inquiries into the traffic

violation by asking unrelated investigatory questions."  Doc. No. 33 at PageID 210.

The Government contends the four traffic violations seen by DEA agents—*i.e.*, following

too close, illegal lane change, failure to stop at a stop sign, and speeding violations—constitute

probable cause to justify the stop of the Nissan that Defendant was driving.  Doc. No. 34 at PageID

222-25.  The Government further asserts that officers did not prolong the traffic stop because

during the K-9's open-air sniff of the Nissan, Nolte was waiting for radio dispatch to respond to

his inquiry about active arrest warrants pending against Defendant.  *Id*. at PageID 225-28.  In

addition, the Government argues reasonable articulable suspicion supported the K-9's open-air

sniff consistent with the Fourth Amendment.  *Id*. at PageID 225-30.

## II.  Historical Facts[1]

The evidence presented during the hearing on Defendant's motion to suppress establishes

---

[1] "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

the following.

### A.    DEA Agent Hobbs

On June 5, 2025, the DEA's office in Dayton received "a tip regarding a potential drug shipment coming in from out of state."  Doc. No. 31 at PageID 98.  DEA agent Nicholas Hobbs testified at the motion to suppress hearing, "[T]he tip pretty much explained that a[n] unknown black male in a dark gray Nissan rental vehicle, a sedan, was transporting drugs from Texas to Indiana, Indiana into Ohio."  *Id*. at PageID 99.  DEA agents in unmarked cars began looking for the Nissan and soon noticed a vehicle matching its description.  *Id*. at PageID 100.

Once Agent Hobbs began following the Nissan, he saw it speed up to approximately 100 miles per hour and commit other violations of traffic law.  *Id*. at PageID 101-02, 119.  He confirmed it had a Texas license plate.  *Id*. at PageID 112-13.

### B.    Trooper Nolte

Ohio State Trooper Nicholas Nolte also saw the Nissan commit traffic violations.  By then Nolte had learned—based on his prior phone conversation with a DEA agent and listening to radio communications between DEA agents—that DEA agents were looking for a suspected narcotics trafficker driving from Texas, through Indiana, and into Ohio in a gray Nissan.  *Id*. at PageID 124.

Nolte soon learned "the possible suspect vehicle [was] approaching one of our agents rapidly[.]" *Id*. at PageID 125.  Upon seeing the Nissan driving east on I-70, Nolte, who was driving a marked Ohio State Troopers cruiser, "began to get in position to get closer to the vehicle."  *Id*.  The Nissan exited I-70 and Nolte continued to pursue it.  He next saw the Nissan turn left at a four-way intersection, then accelerate above the speed limit in a rural area off I-70.  Nolte "estimated the vehicle's speed at approximately 75 miles per hour."  *Id*. at PageID 128.  As he continued his pursuit, Nolte passed a few vehicles and "was going 80 miles per hour and just barely catching

3

that suspect vehicle." *Id*. Nolte then initiated a traffic stop of the Nissan by turning on his lights and siren. *Id*. at PageID 129.

The Nissan pulled over right away and parked on Upper Lewisburg Salem Road. *Id*. at PageID 129, 152. Both vehicles were on the side of this rural two-lane road. *See* Gov't Exh. 1A. Nolte first walked up to the Nissan's passenger side, leaned slightly into the window and spoke with Defendant, the driver. *See id*. He then moved to the driver's side and asked Defendant to exit the car. Doc. No. 31 at PageID 152-53. Defendant readily complied. *Id*. at PageID 153. Nolte then told Defendant he wanted to make sure he wasn't intoxicated. *Id*. He also told Defendant his behavior was "wigging him [Nolte] out," referring to Defendant's "jumpiness in … movements … looking around. Looking behind[.] His driving behavior…. Hi[s] talking very quickly." *Id*. at PageID 155.

When Nolte looked into the Nissan's interior he did not see any narcotics in plain sight. *Id*. at PageID 156. After Defendant exited the Nissan, Nolte patted him down but did not find any narcotics or weapons. *Id*. Around this time, Nolte secured Defendant in the back seat of his cruiser. *Id*. at PageID 157. He then radioed Defendant's driver's license number to dispatch, seeking information about his driving history and whether any arrest warrants were pending against him. *Id*. at PageID 157-58. While waiting, Nolte had not yet decided whether to issue Defendant a warning or traffic citation. *Id*. at PageID 158.

Nolte soon left the cruiser with Defendant seated in back and began walking towards the Nissan. He then heard Defendant yell an expletive. *Id*. at PageID 133. Video evidence confirms this occurred. *See* Gov't Exh. 1A. According to Nolte, this was "not a normal thing to happen[.]" Doc. No. 31 at PageID 161. The video and its accompanying audio reveals that when Nolte returned to his cruiser, he asked Defendant if he was ok and where he was coming from. *See* Gov't

4

Exh. 1A.  Defendant responded the Houston, Texas area.  *See id*.

At this point, according to Nolte, "Based off the observations [he] already made, [he] had some suspicion that something may be involved criminally outside of just traffic violations."  *Id*. at PageID 159.  Nolte testified, "[T]he easiest thing for me to check at that point is to see if the presence of a narcotic odor is present."  *Id*. at PageID 161.  Using a trained narcotics-detection dog named "Red," Nolte walked twice around the Nissan with Red performing an open-air sniff.[2]  Nolte watched Red to see if he displayed any "alert behavior."  He explained,

> So [Red's] alert behavior, which is -- alert is what we call a K-9 who detects the odor of a narcotic he is trained to detect, but is unable to -- or has not located the source yet.  So once that dog smells that odor, he then displays certain behaviors.
>
> So the alert behaviors for [Red] are head snaps, increased respiration through his nose, squaring up to the vehicle, bracketing, which is working that scent cone left to right, to left to right or working one side back and forth.

*Id*. at PageID 135.  Nolte also explained that Red performs a specific "indication" when he has detected a narcotic odor and its main source.  *Id*. at PageID 135-36.  "[Red's] trained final response or his indication is a sit, a freeze, or a down."  *Id*.

### C.     K-9 Officer Red and the Video Evidence

Nolte's unrebutted testimony during the suppression hearing revealed that both he and Red underwent seven weeks of training at OPOTA, the Ohio Police Officer Training Academy, and both earned OPOTA certification.  Doc. No. 31 at PageID 122.  Nolte explained that dogs trained for narcotics detection indicate their possible presence by either an "alert" or an "indication."  *Id*. at PageID 135-36.  "[An] alert is what we call a K-9 who detects the odor of a narcotic he is trained to detect, but is unable to -- or has not located the source yet."  *Id*. at PageID 135.  An indication

---

[2] Nolte is trained as a police K-9 handler.  *Id*. at PageID 121-23.  He and Red trained together.  *Id*. According to Nolte, "[T]the only thing [Red is] trained for is to detect narcotics[,]" specifically cocaine, "crack," heroin, methamphetamines, and their derivatives.  *Id*. at PageID 165.

5

is a K-9's "response to the detection of narcotic odor and the source of it."  *Id*. at Page ID 135-36. Red's "trained final response or his indication is a sit, a freeze, or a down."  *Id*. at PageID 136. Nolte indicated that video of Red's open-air sniff shows he pauses to lick the Nissan's gas cap then "freezes for several seconds."  *Id*. at PageID 136, 139.

Video evidence presented during the motion to suppress hearing confirms Red briefly— and abruptly—froze after licking the Nissan's gas cap.  *See* Gov't Exh. 1(A) at 17:59:14-21.  Based on this indication by Red, Nolte searched first the back seat then the trunk of the Nissan.  Doc. No. 31 at PageID 181; *see* Gov't Exh. 1A.  Defendant did not consent to Nolte's search of the Nissan's trunk.  Doc. No. 31 at PageID 181.

In the trunk Nolte found duffle bags containing multiple bricks tightly wrapped in plastic. *Id*. at PageID 143; *see* Gov't Exh. 2.  Later-performed lab testing showed the bricks contained cocaine and fentanyl.  Doc. No. 31 at PageID 185.

### III.    The Fourth Amendment

The Fourth Amendment forbids "unreasonable searches and seizures" and provides, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. art. IV. "'It is well settled under the Fourth Amendment that a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions.'"  *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (quoting *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560-61 (6th Cir. 2018) (cleaned up).  A traffic stop supported by probable cause is one exception.  *Whren v. United States*, 517 U.S. 806, 810-12 (1996); *see United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022).

A defendant may assert a violation of the Fourth Amendment and seek suppression of

evidence by filing a pretrial motion.  *See* Fed. R. Crim. P. 12(b)(3)(C).  The burden is on the defendant to show "a violation of some constitutional or statutory right justifying suppression.'" *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman,* 606 F.2d 673, 679 n. 11 (6th Cir. 1979)).

## IV.     Analysis

### A.     The Traffic Stop

A police officer may stop a vehicle without violating the Fourth Amendment when the officer has probable cause to believe its driver has violated a traffic law.  *Whren v. United States*, 517 U.S. 806, 810-12 (1996); *see United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022) ("[T]he reasonableness of the [traffic] stop is contingent only upon whether 'the police have probable cause to believe that a traffic violation has occurred'" (quoting *Whren*, 517 U.S. at 810)). The inquiry into probable cause focuses on "the validity of the officers' objective explanation for making the [traffic] stop." *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003) (discussing *Whren,* 517 U.S. at  812-13).  "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* (quoting *Whren,* 517 U.S. at 813).

During the evidentiary hearing on Defendant's motion to suppress, the unrebutted DEA agent Hobbs testified that while he followed the Nissan on June 5, 2025, it began speeding[3] ("I had to accelerate to approximately a hundred miles an hour just to maintain a visual of the suspect vehicle" (Doc. No. 31 at PageID 102)); it slowed and crossed double white lines without signaling ("[it] proceed[ed] to travel all the way over to the far right lane…, cutting off a semitruck" (*id*. at PageID 103, 110)); it then failed to stop at a stop sign (he saw it "pretty much go through a four-

---

[3] Agent Hobbs was driving an unmarked vehicle during the events he observed.  Doc. No. 31 at PageID 126-27.

way stop intersection -- stop signs, failure to stop" (*id*. at PageID 104); and it followed too close to the vehicle ahead of it ("following way too close to the agent in front of him" (*id*. at PageID 110)).[4]  Hobbs's observation of these violations, single or cumulative, of Ohio traffic law establishes probable cause to support the traffic stop of the Nissan.  *See Herbin*, 343 F.3d at 810 (seeing a car run a red light and twice cross the center line gave agents an objectively justifiable basis, and hence probable cause, to stop the car); *see also United States v. McKenzie*, No. 21-3587, 2022 WL 1744500, at *4 (6th Cir. May 31, 2022) ("An officer who observes a traffic violation has probable cause to stop the vehicle").

Although Hobbs did not actually perform the traffic stop of the Nissan, Trooper Nolte testified he initiated the stop of the Nissan based on radio communications he overheard involving DEA agents, who reported the Nissan had violated Ohio traffic laws, including speeding up to approximately 100 miles per hour and crossing a solid white line.  Doc. No. 31 at PageID 126-29. The Government maintains that the radio information Trooper Nolte heard about the traffic violations DEA agents observed provided him with collective knowledge sufficient to support the traffic stop of the Nissan.  Doc. No. 34 at PageID 222-25.  This is correct.[5]  *See United States v. Murray*, No. 3:16-cr-160, 2017 WL 2481272, at *2 (S.D. Ohio June 8, 2017) ("The 'collective knowledge' doctrine allows an officer to conduct a traffic stop pursuant to information obtained by a fellow officer.  [T]he 'collective knowledge' doctrine applies when an officer effectuates a stop at the direction of another officer who possesses the requisite knowledge to render the stop [c]onstitutionally allowable" (discussing *United States v. Lyons*, 687 F.3d 754, 766-67 (6th Cir.

---

[4] Speeding, improper lane change, not stopping at a stop sign, and following too close to another vehicle violate Ohio traffic laws.  *See* Ohio Rev. Code §§  4511.21, 4511.33, 4511.34, 4511.39.

[5] Seeing the Nissan speeding also gave Trooper Nolte probable cause to stop of it.  *See McKenzie*, 2022 WL 1744500, at *4 ("An officer who observes a traffic violation has probable cause to stop the vehicle").

2012)); *United States v. Frantz*, No. 3:25-cr-00004, 2025 WL 3216645, at *3 (E.D. Ky. Nov. 18 2025) ("It is well-established that police may rely on the collective knowledge doctrine to establish probable cause to stop a vehicle based on the observations of traffic violations by other officers communicated to the officer executing the traffic stop").

Defendant's assertion—that DEA agents based their request to the state troopers to stop the Nissan almost entirely on a tip they had received from an anonymous and unreliable informant (Doc. No. 28 at PageID 67-71)—does not show the traffic stop lacked probable cause. Assuming, in Defendant's favor, DEA agents wanted the Nissan stopped based on an unknown informant's tip concerning narcotics trafficking, their subjective motivations are irrelevant to the probable cause determination. *See Herbin*, 343 F.3d at 809 (Law enforcement officers' "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" (quoting *Whren,* 517 U.S. at 813)). Given the previously detailed objective reasons and, hence probable cause, supporting the stop of the Nissan, the DEA agents' additional subjective motivations, even if true, are irrelevant. *See id*.

Defendant also contends Nolte unlawfully detained Defendant to investigate matters beyond the scope of the traffic stop. Doc. No. 36 at PageID 238. To the extent Defendant challenges Nolte's request for Defendant to exit the Nissan and sit in the police cruiser, he was not detained in violation of the Fourth Amendment. "[A]n officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity would be well within the bounds of the initial stop." *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999); *United States v. Delano*, 543 F. Supp. 2d 791, 799 (N.D. Ohio 2008) ("An officer may … lawfully detain a defendant in the back of a squad car while writing citations, checking drivers license information, and running other radio checks, so long as it does

9

not prolong the stop.  Therefore, in this case, [the officer's] placing [defendant] in his police car while he ran his and [the other defendant's] social security numbers and wrote the ticket was permissible").

To the extent Defendant maintains his detention lasted beyond the duration and scope of the traffic stop, the required Fourth Amendment inquiry turns to reasonable suspicion.

### B.        Reasonable Suspicion

#### 1.

"A lawful traffic stop must … be limited in scope and duration."  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *see United States v. Whitley*, 34 F.4th 522, 529 (6th Cir. 2022). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id*. at 354 (analogizing *Terry v. Ohio,* 392 U.S. 1 (1968) (other citations omitted)).

"An officer may lawfully extend a stop when reasonable suspicion arises of wrongdoing or danger to the officer or others."  *United States v. Daniel-Dejesus Santos*, 161 F.4th 1007, 1011 (6th Cir. 2025).  "Reasonable suspicion sets a modest bar." *United States v. Urraca*, 123 F.4th 834, 836 (6th Cir. 2024). To satisfy it, "an officer must put forth 'more than an inchoate and unparticularized suspicion or 'hunch.' " *Whitley*, 34 F.4th at 532 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  "Reasonable suspicion, however, requires 'considerably less than proof of wrongdoing by a preponderance of the evidence.'  'Reviewing courts must look to the totality of the circumstances of each case to see whether the detaining officer has a particularized or objective basis for suspecting legal wrongdoing." *Id*. (first quoting *Sokolow*, 490 U.S. at 7; and then quoting *United States v. Belakhdhar*, 924 F.3d 925, 927 (6th Cir. 2019)).  The analysis "focus[es] on

10

commonsense inferences rather than any 'neat set of legal rules,' and view[s] the facts through a broad rather than a narrow lens." *Santos*, 161 F.4th at 1011 (first quoting *Ornelas*, 517 U.S. at 695-96; and then quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). "This standard is an objective one." *United States v. Noble*, 762 F.3d 509, 522 (6th Cir. 2014). It is satisfied when "a reasonably prudent person in the circumstances would be warranted in the belief that his or her safety or that of others was in danger[.]" *Id*. at 521-22 (citation modified) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

It is worth emphasizing in the instant case, "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas*, 517 U.S. at 696.

**2.**

The Government contends, "The traffic stop was not[] in any way prolonged as *Rodriguez* contemplated, because Trooper Nolte would not have released [Defendant]. He was still waiting on dispatch to relay if [Defendant] was legally permitted to drive or whether he had any warrants out for his arrest. It was during this time while he was waiting for dispatch to get back to him that he ran K-9 officer Red around the [Nissan] Altima." Doc. No. 34 at PageID 227 (citing Doc. No. 31 at PageID 141 (citations omitted)). The Government overemphasizes the relatively brief length of time the K-9 open-air sniff took and its completion before Trooper Nolte heard back from dispatch. There is no doubt that Trooper Nolte's questions to dispatch about Defendant's driving history and possible arrest warrants fell within his traffic-stop mission. *Rodriguez*, 575 U.S. at 355 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary

11

inquiries incident to the traffic stop.  Typically … checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" (citations omitted; citation modified)).  His question to Nolte asking where he was coming from that day was permissible.  *Cf. Whitley*, 34 F.4th at 530 ("The further questions of whether Whitley had anything illegal in the vehicle and where he was coming from are permissible only because [the officer] asked these questions during the time that Whitley was retrieving his license and registration"); c*f. U.S. v. Potts*, No. 97-6000, 1999 WL 96756, at *4 (6th Cir. Feb. 2, 1999) ("It is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop").

A dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'"  *Rodriguez*, 575 U.S. at 355 (quoting *Indianapolis v. Edmond,* 531 U.S. 32, 40-41 (2000); citing *Florida v. Jardines,* 569 U.S. 1, 8-10, 133 S.Ct. 1409, 1416-17 (2013)).  As such, reasonable suspicion, assessed from the viewpoint of an objective officer, must support Nolte's decision to deploy K-9 officer for an open-air sniff of Nissan.  *See United States v. Howard*, 815 F. App'x 69, 76 (6th Cir. 2020) ("'A seizure can be extended' for reasons outside the initial scope of the traffic stop 'if something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot.'"  (quoting *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020)).

Considering the totality of the circumstances Nolte faced and the sum of the historical facts he understood at the time, including information developed during the stop, reasonable suspicion supported the decision to deploy Red to conduct an open-air sniff around the Nissan.  Nolte understood, based on his phone conversation with a DEA agent and the DEA radio

12

communications he overheard, that DEA agents had been following a dark gray Nissan with a Texas license plate driving east on I-70.  *See* Doc. No. 131 at PageID I (Nolte testified, "I was briefed .. there was a suspected narcotic … or drug trafficker coming from Texas…, up into Indiana, and … on his way into Ohio").  Nolte also knew the dark gray Nissan Defendant had been driving matched the description of the car the DEA suspected of trafficking drugs into Ohio.  *Id*.  Such communications, when considered alone, generally provide weak support to extend a traffic stop.  *See United States v. King*, No. 24-1089, 2025 WL 2172432, at *8 (6th Cir. July 31, 2025) (DEA task force member "informed uniformed troopers, when instructing them to attempt the traffic stop, that [the defendant] was bringing methamphetamine from downstate to the Upper Peninsula.  Taken alone, [this] relayed information does not provide reasonable suspicion to extend the stop") (citing *Noble*, 762 F.3d at 522–25)).  Yet, when combined with other information Nolte knew, the facts supporting reasonable suspicion begin to accumulate.  *See id*. ("Where Immel [the trooper conducting the traffic stop] developed his own articulable suspicions that [the defendant] was trafficking drugs, this information … helps justify Immel's prolonging of the traffic stop").

Nolte testified Defendant's driving constituted "elusive behavior … a big sign that stood out[.]"  Doc. No. 31 at PageID 145-46.  He explained, "It's not normal for people to try to evade random cars[6] on the interstate unless they're specifically looking for people following them."  *Id*. at 146 (footnote added).  Defendant's evasive driving, which included speeding up to approximately 80 and 100 miles per hour, and multiple other observed traffic violations, strongly support the existence of reasonable suspicion that he was possibly engaged in criminal activities such as narcotics trafficking.  *Cf. United States v. Ledbetter*, 929 F.3d 338, 347 (6th Cir. 2019) ("This court has held repeatedly that a driver's behavior—most notably, the failure to immediately

---

[6] Again, Agent Hobbs was in an unmarked care when following the Nissan.  *Supra*, n. 3.

pull over and any attempts to evade officers—can support a reasonable suspicion").  It was also reasonable for Nolte to think that Defendant's possible criminal activity might include narcotics trafficking based on the matching information (a grey Nissan with Texas license plates traveling east on I-70 from Indiana into Ohio) he had received from the DEA prior to the traffic stop.  *See United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994) ("Reasonable suspicion can be based upon police officers' own observations or upon the collective knowledge of other officers").

Next, Defendant's nervousness—his appearance of being under "a lot of pressure" when answering Nolte's routine traffic-stop questions; the fact Defendant yelled an expletive; and his impatience in wanting to get his ticket and leave—constitutes "a relevant but 'unreliable indicator [of reasonable suspicion], especially in the context of a traffic stop." *United States v. Calvetti*, 836 F.3d 654, 666 (6th Cir. 2016) (quoting *United States v. Stepp*, 680 F.3d 651, 665 (6th Cir. 2012)). "Many citizens become nervous during a traffic stop, even when they have nothing to hide or fear." *United States v. Winters*, 782 F.3d 289, 299 (6th Cir. 2015) (citation modified) (quoting *United States v. Richardson,* 385 F.3d 625, 630-31 (6th Cir. 2004)).  However, Defendant's nervousness, when viewed by an objective standard, is a relevant consideration and adds a small indication of reasonable suspicion to the total circumstances Nolte faced.  *See id*. at 666-67 (Considering nervousness a weak indicator, but together with more significant factors, as part of the reasonable-suspicion inquiry); *see also Robinson v. Kue*, No. 2:23-cv-12355, 2025 WL 1560133, at *4 (E.D. Mich. June 2, 2025) ("Although 'a certain level of nervousness may be expected during encounters with the police' and is thus, 'insufficient, by itself, to find reasonable suspicion," even 'innocent conduct, when examined in its totality, can support a finding of reasonable suspicion'" (quoting *United States v. Tillman*, 543 Fed. App'x 557, 562 (6th Cir. 2013)).

In conclusion, when viewed from the standpoint of a reasonable officer, and considering

14

the totality of the circumstances—the drug-trafficking information Nolte learned from DEA agents; the information Nolte overheard during the agents' radio communications before the traffic stop; combined with—most significantly—Nolte's observations of Defendant's dangerous, evasive driving in violation of Ohio traffic law; and to a lesser degree, Defendant's somewhat unusually nervous behavior during the traffic stop—constitute a particularized basis, and more than a mere hunch, to suspect Defendant of transporting narcotics into Ohio.  For these reasons, reasonable suspicion supported Nolte's decision to deploy Red to conduct an open-air sniff around the Nissan.  *See Whitley*, 34 F.4th 522, 532 ("Reasonable suspicion, however, requires 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" (quoting *Sokolow*, 490 U.S. at 7)).

### C.      K-9 Officer Red and Probable Cause to Search the Nissan

Defendant argues that K-9 Officer Red, during his open-air sniff, did not give a final reliable indication contraband was present in the Nissan.  As a result, according to Defendant, Nolte's subsequent search of the Nissan's trunk, and the other broader searches of the Nissan's interior, lacked probable cause and violated the Fourth Amendment.  Defendant therefore contends all evidence found in the Nissan must be suppressed.  Doc. No. 28 at PageID 73-78; Doc. No. 33 at PageID 213-15; Doc. No. 36 at PageID 242-44.

The Government contends that Red's behavior during the search provided probable cause to support the subsequent searches of the Nissan.  Doc. No. 34 at PageID 229-30.

The Fourth Amendment's search warrant requirement is limited by the automobile exception.  *United States v. Woods*, 168 F.4th 952, 954 (6th Cir. 2026)  "[T]he automobile exception allows warrantless searches of a car if officers have probable cause to believe it contains evidence of a crime." *Id*. (citing *California v. Acevedo*, 500 U.S. 565, 578-80 (1991); *United States*

*v. Simpson*, 138 F.4th 438, 444 (6th Cir. 2025)).  "An alert to the presence of drugs by a properly trained narcotics detection dog is sufficient to establish probable cause to search a vehicle." *United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012).

Both Nolte and K-9 officer Red's OPOTA's certification, following seven weeks of training, is presumptive evidence of Red's reliability to perform open-air searches for cocaine and certain other narcotics.  *See United States v. McCarley-Connin*, 148 F.4th 808, 817 (6th Cir. 2025) "[W]hen a 'bona fide organization' certifies the dog, his alert presumptively provides probable cause." (citing *Florida v. Harris*, 568 U.S. 237, 246-47 (2013)).  Review of the video documenting Red's Open-air sniff around the Nissan shows he froze briefly and abruptly—and as Nolte testified, "a short freeze but obvious" (Doc. No. 31 at PageID 184)—as his final indication he smelled narcotics.  *See id*. at PageID 136, 138-39; *see also* Gov't Exh. 1A at 17:59:14-21.  Based on this, probable cause supported the subsequent search of the Nissan.  *See Sharp*, 689 F.3d at 618.

### V.  Conclusion

For all of the above reasons, Defendant's motion to suppress is **DENIED**.

**IT IS SO ORDERED.**

April 24, 2026                          s/*Michael J. Newman*
                                        Hon. Michael J. Newman
                                        United States District Judge

16